IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| M.W., a minor, by and through his parents and natural guardians, Mr. J.W. and Ms. R.J., and Mr. J.W. and Ms. R.J., in their own right. | Civil Action No. 2:24-cv-609 |
| **Plaintiffs**, | |
| v. | |
| Kentucky Avenue School, | |
| **Defendant**. | Jury Trial Demanded |

**COMPLAINT**

AND NOW come the Plaintiffs, M.W., a minor, by and through his parents and natural guardians, Mr. J.W. and Ms. R.J., and Mr. J.W. and Ms. R.J., in their own right, by and through their counsel, Kristen C. Weidus, Esquire, Jessica L. Tully, Esquire, and Ruder Law, LLC, alleging the following:

**Preliminary Statement**

1. This is a civil action brought by M.W., a minor child with a disability, by and through his parents and natural guardians, Mr. J.W. and Ms. R.J., and also Mr. J.W. and Ms. R.J. in their own right.

2. Plaintiffs allege violations of Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations, and Title II of the Americans with Disabilities Act ("ADA"). Plaintiffs also raise a breach of contract claim.

**Parties**

3. Plaintiff, M.W., a minor child, resided with his parents, Mr. J.W. and Ms. R.J., at all relevant times pertaining to the instant matter.

4. M.W. was a third grade student in the Kentucky Avenue School during the 2022-2023 school year.

5. Plaintiff Mr. J.W. is M.W.'s father and natural guardian. Mr. J.W. is the husband of Ms. R.J.

6. Plaintiff Ms. R.J. is M.W.'s mother and natural guardian. Ms. R.J. is the wife of Mr. J.W.

7. Defendant, Kentucky Avenue School ("KAS"), is an educational institution located at 5701 Fifth Avenue, Pittsburgh, PA 15232.

8. Upon information and belief, KAS is a recipient of federal funds and is therefore legally bound by the provisions of Section 504 and the Americans with Disabilities Act.

9. Plaintiff M.W. no longer attends KAS as a student, but at all relevant times pertaining to the instant action, M.W. attended KAS.

**Jurisdiction and Standing**

10. This Complaint seeks appropriate relief for violations and denial of equal access to education pursuant to Section 504 (29 U.S.C. § 794), violations of Title II of the ADA, and a breach of contract claim.

11. This action arises under the laws of the United States, and therefore this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

12. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b). The actions complained of took place in this judicial district, evidence and pertinent

records relevant to the allegations would be maintained in this judicial district, and the Defendant is present and/or conducts affairs in this judicial district.

13. This Court has subject-matter jurisdiction over the Plaintiffs' Pennsylvania breach of contract claim because these state law issues are so related to the Plaintiffs' federal claims that they form one case and controversy, giving this Court supplemental jurisdiction under 28 U.S.C. § 1367(a).

## Factual Allegations

### General Background Information

14. Plaintiff M.W., a minor child, enrolled at KAS when he was in Kindergarten for the 2019-2020 school year.

15. M.W. is diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and has a hearing impairment.

16. During the 2021-2022 and 2022-2023 school years, when he was in second and then third grade, M.W. was the subject of harassment and physical abuse by KAS teacher assistant, Ms. Amrita Mehta, on at least six occasions during that time, and no intervention from other KAS teachers, staff, or administrators was provided.

17. M.W.'s parents, Mr. J.W. and Ms. R.J., did not become aware of the earlier incidents until May 4, 2023, when M.W. was assaulted again.

18. Specifically, in the early afternoon of May 4, 2023, M.W. was at recess in the KAS courtyard with his third-grade classmates, teacher assistant Ms. Mehta, and outside student aide Ms. Erin Junker.

19. Ms. Junker was employed by Connection Counseling and Consultation, Inc. as a Community Inclusion Coach at KAS.

20. After recess, M.W. was whistling as he walked into the building and entered the foyer area, just outside the academic area of the building.

21. Ms. Mehta told M.W. to stop whistling. This directive was delivered despite Ms. Mehta's awareness that M.W. is a student with a hearing impairment and does not always hear or understand verbal instructions.

22. M.W. continued whistling, and Ms. Mehta told him that he would be left "outside by yourself" if he did not stop.

23. Ms. Mehta then proceeded to block M.W.'s entry to the academic area with her body.

24. M.W. started to panic at the threat of being locked out of the school and wanted to access a perceived safe space inside the academic building.

25. M.W. then attempted to bypass Ms. Mehta as she continued to block his entry through the doorway.

26. Ms. Mehta then grabbed M.W. by the collar and simultaneously pinched his neck, shoving him against the wall, causing his shoulders and head to bang against it.

27. Ms. Mehta then smacked M.W. on his face, leaving red marks on his face and neck area, which he observed in the bathroom mirror shortly after the incident.

28. As she shoved and struck him, Ms. Mehta threatened M.W. and said that if he hit her, she would hit him back.

29. This incident was witnessed by several third grade students and by outside aide, Ms. Junker.

30. KAS staff member Ms. Sherry Wolfe was advised just after the incident verbally and in a written statement from Ms. Junker.

31. KAS staff member, Mr. Minh Do, was verbally advised by M.W. and Ms. Junker about the incident, and he indicated in response that he did not want to get involved.

32. KAS Head of School, Ms. Ellen McConnell Sanderson, called Ms. R.J. about four hours after the incident

33. Ms. Sanderson told Ms. R.J. that M.W. was suspended from KAS indefinitely for "punching" Ms. Mehta.

34. Later that same day, M.W.'s father, Mr. J.W., and Ms. R.J. asked M.W. about the incident, and he explained in detail what actually happened.

35. M.W. also said that this was not the first time Ms. Mehta had been physically aggressive with him.

36. M.W. said that Ms. Mehta had dragged him by the arm, squeezed, pushed, and pulled him on five other occasions during the 2022-2023 school year and the 2021-2022 school year.

37. Mr. J.W. and Ms. R.J then told Ms. Sanderson on a second phone call on May 4, 2023 that Ms. Mehta had bullied, harassed, and physically harmed M.W. on that day and on prior occasions.

38. On May 9, 2023, Mr. J.W. and Ms. R.J. met in-person with Head of School Ms. Sanderson. Mental health specialist, Ms. Cassandra Dunphy-Lie, participated in the meeting by video call.

39. Ms. Sanderson presented a Social/Emotional Support Plan to help M.W.'s "pattern of concerning behaviors".

40. The plan stated: "[M.W.] has consistently struggled with unstructured time. This can be a result of his ADHD diagnosis and the school continues to work with him trying many

different ways to help him feel successful." The plan provided a list of warning signs, triggers, and interventions to support M.W.

41. Ms. Lieb acknowledged during the meeting that she had quickly assembled the plan earlier that same day the plan at the request of Ms. Sanderson.

42. M.W.'s behaviors related to his disability and were not new to KAS staff. In fact, in October 2022, Ms. Junker, at the request of M.W.'s parents, emailed Head of School Ms. Sanderson to propose an action plan and positive reinforcement system for M.W.

43. Ms. Sanderson admitted during the May 9 meeting that KAS did not adopt any of the strategies proposed by Ms. Junker. She also stated that she had not followed up since October regarding the provision of support for M.W. in accordance with the plan.

44. M.W. was ultimately suspended for six school days in response to the May 4, 2023 incident with Ms. Mehta.

45. On May 9, 2023, at a public school board meeting, Mr. J.W. verbally advised the KAS School Board and other attendees, including Ms. Sanderson, that a staff member had assaulted and bullied his child at the school.

46. On May 10, 2023, Mr. J.W. and Ms. R.J. provided a detailed written report and inquiry of the May 4, 2023 incident, other similar incidents, and related concerns to KAS School Board executives, Ms. Czarina Kulick and Ms. Mari Pena Jordan.

47. KAS School Board executives subsequently cancelled a scheduled meeting to address the matter with Mr. J.W. and Ms. R.J.

48. M.W. was finally allowed to return to school on May 15, 2023, with the stipulation from Mr. J.W. and Ms. R.J. that Ms. Mehta be kept out of the school and have no contact or proximity to their children.

49. Mr. J.W. and Ms. R.J. advised Ms. Sanderson that their children, M.W. and M.W.'s sibling who also attended KAS, did not feel safe at the school when Ms. Mehta was present.

50. Ms. Mehta returned to work at the school on May 24, 2023. At that time, Mr. J.W. and Ms. R.J. were informed by Ms. Sanderson that the KAS "investigation" was closed and the matter would not be addressed or discussed further by KAS.

51. Head of School Ms. Sanderson and the KAS School Board executives would not provide any additional detail as to the nature, scope, findings, or remedial action of the KAS investigation, or produce any documentation even confirming that an investigation was actually completed.

52. Mr. J.W. and Ms. R.J. chose to unenroll M.W. and his sibling from KAS prior to the 2023-2024 school year as a direct result of their safety concerns, as Ms. Mehta continued to be employed as a teacher assistant.

53. Mr. J.W. and Ms. R.J. had previously paid $12,725.00 in tuition fees for M.W. for the 2022-2023 school year.

54. Mr. J.W. and Ms. R.J. had previously paid a $1,000.00 deposit in advance of the 2023-2024 school year, which was not reimbursed.

**Count I: Violation of Section 504 of the Rehabilitation Act of 1973**

**Count II: Violation of Title II of the Americans with Disabilities Act**

*M.W., a minor, by and through his parents and natural guardians, Mr. J.W. and Ms. R.J. v. Kentucky Avenue School*

55. The averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

56. Section 504 prohibits disability discrimination by recipients of federal funds. The statute provides that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]. 29 U.S.C. § 794(a).

57. Section 202 of the ADA similarly states:

> "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.

58. The same standards govern both the Section 504 and ADA claims. *S.H. ex rel. Durrell v. Lower Merion School District*, 729 F.3d 248, 260 (3d Cir. 2013). Thus, Counts I and II will be considered together here.

59. Since Section 504's definition of a disability is identical to the Americans with Disabilities Act's definition, it is appropriate to look to the ADA for guidance in interpreting the definition. *Centennial School Dist. v. Phil L. ex rel. Matthew L,* 799 F.Supp.2d 473, 483 (E. D. Pa. 2011).

60. An individual with a disability is defined under the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A).

61. "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

62. M.W.'s hearing impairment and ADHD (including his struggles with hyperactivity and impulsivity) substantially limit one or more major life activities, including his ability to learn, hear, and concentrate. Therefore, he can be considered a person with a disability as defined by the ADA and Section 504.

63. If a school acts with deliberate indifference, it may satisfy a claim for compensatory damages. *S.H. ex rel. Durrell,* 729 F.3d at 262.

64. Deliberate indifference requires both (1) knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that likelihood." *Id.* at 261 (quoting *Duvall v. Cnty. Of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

65. The deliberate indifference standard "does not require a showing of personal ill will or animosity toward the disabled person." *S.H.,* 729 F.3d at 263 (citing *Meagley v. City of Little Rock,* 639 F.3d 384, 389 (8th Cir. 2011)) (quoting *Barber v. Colo. Dep't of Revenue,* 562 f.3d 1222, 1228-29 (10th Cir. 2009)).

66. M.W., as a student with a disability, had a right to access educational programming in the same way as other children.

67. Defendant KAS was aware that he had a medical history that impeded his ability to access his educational programming but failed to provide any meaningful behavioral support.

68. This lack of behavioral support and repeated mistreatment by staff adversely impacted M.W.'s behaviors throughout the 2022-2023 school year.

69. On May 4, 2023, it was M.W.'s whistling that led to Ms. Mehta inappropriately disciplining him by grabbing him by the collar, pinching his neck, pushing him against the wall, and smacking him on his face.

70. This form of physical discipline and punishment, including dragging, pushing, and pulling him, occurred on five other occasions during the 2022-2023 and 2021-2022 school years.

71. The outside student aide, Ms. Junker, had previously advised Head of School, Ms. Sanderson, that M.W. needed additional support and interventions so that he could access his education, but KAS refused to act.

72. Therefore, the first prong of the deliberate indifference standard was met, as the school had knowledge that M.W. was not receiving appropriate behavioral support, further evidenced by the belated May 9 Social/Emotional Support Plan to help M.W.'s "pattern of concerning behaviors."

73. The plan stated: "[M.W.] has consistently struggled with unstructured time. This can be a result of his ADHD diagnoses and the school continues to work with him trying many different ways to help him feel successful."

74. Defendant also had knowledge that Ms. Mehta was hitting, dragging, squeezing, pushing, or pulling M.W. to discipline him inappropriately, as these incidents occurred several times on KAS premises during the 2022-2023 and 2021-2022 school years.

75. The second prong of the deliberate indifference standard was thus also met.

76. Until May 9, 2023, Defendant did not attempt to provide appropriate behavioral support or interventions to enable M.W. to access his education.

77. This lack of behavioral support was despite Ms. Junker emailing Ms. Sanderson in October 2022 to propose a positive reinforcement system for M.W.

78. More than six months later, on May 9, 2023, Defendant finally developed a Social/Emotional Support Plan.

79. As such, it is clear that Defendant acted with deliberate indifference in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all remedies available under Section 504 and the ADA, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

**Count III: Denial of FAPE under Section 504 the Rehabilitation Act of 1973**

*M.W., a minor, by and through his parents and natural guardians, Mr. J.W. and Ms. R.J. v. Kentucky Avenue School*

80. The averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

81. Section 504 of the Rehabilitation Act prohibits recipients of federal funding from discriminating on the basis of disability. 29 U.S.C. § 794(a).

82. Discrimination on the basis of disability is established upon a showing that: (1) a student is "disabled" under the Act; (2) he or she is otherwise qualified to participate in school activities; (3) the school receives federal financial assistance; and (4) the student was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999). Additionally, it must be established that the defendant knew or should be reasonably expected to have known of his or her disability. *Id*.

83. Discrimination prohibited by Section 504 includes the failure to provide "a free appropriate public education to each qualified handicapped person." *Id*.

84. A free appropriate public education ("FAPE") is "the provision of regular or special education and related services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1).

85. M.W. is disabled under the Act because his disabilities of ADHD and a hearing impairment substantially limit his learning and concentrating. *See* 29 U.S.C. §§ 705(20), 794(a); *see also* 42 U.S.C. § 12102(1)-(2).

86. M.W. was otherwise qualified to participate in Defendant's program.

87. Upon information and belief, Defendant receives federal financial assistance.

88. Defendant knew of M.W.'s disabilities as evidenced by the May 9 Social/Emotional Support Plan.

89. The plan stated: "[M.W.] has consistently struggled with unstructured time. This can be a result of his ADHD diagnoses and the school continues to work with him trying many different ways to help him feel successful."

90. M.W. was denied the benefits of Defendant's educational program when Defendant failed to provide him reasonable accommodations, despite his known disability status. As a result, he was denied a benefit provided to all students—access to his educational program—solely because of his disabilities.

91. The record supports M.W.'s denial of FAPE claim, and thus, Defendant violated the rights provided to him under Section 504.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all remedies available under Section 504, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## Count IV: Breach of Contract

### *Mr. J.W. and Ms. R.J. v. Kentucky Avenue School*

92.     The averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

93.     To establish a breach of contract claim under Pennsylvania law, a party must establish: (1) the existence of a contract; (2) a breach of duty imposed by the contract, and (3) damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003). See also *Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 F. App'x 202 (3d Cir. 2003) (citation omitted).

94.     Mr. J.W., Ms. R.J, and KAS were parties to an Enrollment Contract, a binding contract. *See* Exhibit A.

95.     During the 2022-2023 and 2021-2022 school years, M.W. was the subject of harassment and physical abuse by teacher assistant, Ms. Mehta, on at least six occasions with no intervention from other KAS teachers, staff, or administrators.

96.     Defendant breached the duty owed to Plaintiffs pursuant to the Enrollment Contract when it failed to intervene and appropriately protect M.W. from harassment and physical abuse by Ms. Mehta.

97.     Despite prior plans to re-enroll for the 2023-2024 school year, Mr. J.W. and Ms. R.J. were forced to unenroll M.W. and his sibling due to safety concerns, as Ms. Mehta continued to be employed as a teacher assistant.

98.     Because of this breach of the Enrollment Contract, Mr. J.W. and Ms. R.J. suffered damages in that their children were not able to continue in Defendant's program and thus their family was forced to quickly secure an alternative.

99. The value of the education provided by Defendant's program goes beyond the actual costs. Defendant's program provides a high level of education, prestige, and social connections.

100. Furthermore, because of this breach, M.W. had a reddened face and neck area from the physical abuse he suffered.

101. Mr. J.W. and Ms. R.J. suffered continual, severe mental and physical anguish due to the breach, as well as lost wages and additional medical bills.

102. Therefore, the record supports Plaintiffs' breach of contract claim.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all remedies that are available, and all other relief that this Honorable Court deems appropriate.

Respectfully Submitted,

RUDER LAW, LLC

 /s/ Jessica L. Tully
Jessica L. Tully, Esq.
PA Attorney ID 324691
Kristen C. Weidus.
PA Attorney ID 313486
One Oxford Center
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Telephone: (412) 281-4959
Email: jessicatully@ruderlaw.com
Email: kristenweidus@ruderlaw.com

 Date: April 23, 2024

EXHIBIT A

Thanks for filling out KAS Enrollment Contract 2022-2023

Here's what was received.

# KAS Enrollment Contract 2022-2023

Email *

[redacted]

Kentucky Avenue School ("KAS" or the "School") agrees to enroll/re-enroll for the entire 2022-2023 academic school year. *

[redacted]

## Parent/Guardian Information

Parent/Guardian Name *

[redacted]

EXHIBIT A

# KAS Enrollment Contract

In consideration of the acceptance of this Enrollment Contract by KAS, the undersigned agrees to abide by the listed conditions and pay the required fees as specified below.

Submission of this Contract by March 25, 2022: KAS offers assistance to families who demonstrate need through the financial aid application process. All families interested in being considered for financial aid must complete a financial aid application online through FACTS at https://online.factsmgt.com/signin/4GDLD by April 30, 2022. Financial Aid is granted to those determined to be in need on a first come, first served basis.

Non-refundable Tuition Deposit: In order to secure enrollment, the Responsible Party agrees to pay and deliver with this Enrollment Contract a non-refundable deposit of $500.00 per child. This tuition deposit will be credited toward annual tuition.

Tuition: By signing the Enrollment Contract, the Responsible Party assumes responsibility for the cost of the 2022-2023 tuition and other charges (less financial aid awarded) No reduction or refund will be made by reason of absence, illness, voluntary withdrawal, suspension, expulsion, or for any other reason, except as stated specifically herein unless approved in writing prior to signing this Enrollment Contract.

Tuition (less financial aid) must be paid in full by August 22, 2022 or arrangements for a payment plan must be made through FACTS Tuition Management Company.

A 3% discount will be offered for those paying in full by August 22, 2022 (not applicable to tuition reduced by financial aid).

If a student is enrolled after the 2022-2023 school year begins, the tuition may be prorated to reflect the months that the student attends KAS.

The School will withhold transcripts for all accounts with overdue balances and also reserves the right to withhold grades in such cases.

If property damage to the School occurs as a result of the student's willful misconduct, gross negligence or conscious indifference, then the School may assess the reasonable cost of repair or replacement.

The School is entitled to be reimbursed for its reasonable attorneys' fees and costs incurred in the collection of any unpaid balance.

Withdrawal: Students who enroll and withdraw within 30 days prior to the beginning of a term are entitled to a 75% refund of tuition fees paid for that term. For purposes of this Enrollment Contract, the first term runs from August 29 to December 31, 2022 and the second term runs from January 1 to June 6, 2023. Tuition fees paid in advance will be refunded in full if a registered student withdraws or is requested to withdraw 30 days or more before the beginning of a term. If a student withdraws or is requested to withdraw during a term, there will be no refund of any tuition paid for that term. In the case of a withdrawal, the Responsible Party must notify KAS in writing by "registered mail" of the withdrawal of the student. The postmark on such

EXHIBIT A

Withdrawal: Students who enroll and withdraw within 30 days prior to the beginning of a term are entitled to a 75% refund of tuition fees paid for that term. For purposes of this Enrollment Contract, the first term runs from August 29 to December 31, 2022 and the second term runs from January 1 to June 6, 2023. Tuition fees paid in advance will be refunded in full if a registered student withdraws or is requested to withdraw 30 days or more before the beginning of a term. If a student withdraws or is requested to withdraw during a term, there will be no refund of any tuition paid for that term. In the case of a withdrawal, the Responsible Party must notify KAS in writing by "registered mail" of the withdrawal of the student. The postmark on such notice will be considered as the date of the request to withdraw the student for purposes of this Enrollment Contract.

School Policy: The Responsible Party, the student and the student's family agree to comply with the rules and regulations of the School as stated in the current handbook, as may be amended from time to time, which is incorporated herein by reference and provided as part of this Enrollment Contract.

Re-enrollment: Successful completion of the current academic year and recommendation of the School are required for re-enrollment of currently enrolled students.

## School's Reserved Rights

This Enrollment Contract does not affect KAS's right to dismiss the student for academic or disciplinary reasons or for any reason stated in the handbook, as may be amended from time to time.

## Photographs and Media

KAS photographs and/or makes audio and/or visual recordings of School events, which may include photographs of students and audience members. KAS also invites students to be quoted or interviewed or to contribute their artistic or literary creations for School promotional material. These photographs, statements, artistic and literary creations, and recordings also may be used in School newsletter, brochures, advertisements, news releases, yearbooks, web pages and other School media. The undersigned consents to the use of such photographs, statements, artistic and literary creations, and recordings in School newsletter, brochures, advertisements, news releases, yearbooks, web pages and other School media.

**EXHIBIT A**

The following tuition schedule will apply for the 2022-2023 academic school year. Please select appropriate grade level(s). *

☐ Kindergarten $13,450

☐ First Grade $13,450

☐ Second Grade $13,635

☑ Third Grade $13,635

☐ Fourth Grade $13,635

☐ Fifth Grade $13,635

☑ Sixth Grade $14,370

☐ Seventh Grade $14,370

☐ Eighth Grade $14,370

## Signature(s)

This Contract shall be interpreted in accordance with the laws of the Commonwealth of Pennsylvania. I understand the conditions of this Contract and acknowledge receiving a copy of it. My signature below affirms that I have read, understood and accept the terms and conditions of this Contract. I understand that this document is the entire Contract and that it cannot be modified except in writing. I understand that my electronic signature is binding. Signatures of parent(s) or guardian(s) financially responsible for student. *

[signature redacted]

# EXHIBIT A

Kentucky Avenue School does not discriminate on the basis of race, color, gender, physical and other disabilities, national or ethnic origin in administration of its educational policies, admission policies, scholarship, financial aid and other school-administered programs.

Create your own Google Form

Report Abuse